IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOSEPH E. WHEELER,         )
       Plaintiff,      )
                 )
    vs               )   Civil Action No. 07-323
                 )
PENNSYLVANIA DEPARTMENT OF   )
CORRECTIONS, SCI-FAYETTE; and   )
LT. SHAWN NOSE, individually and in his )
capacity as an Officer with the Pennsylvania )
Department of Corrections, SCI-Fayette,  )
       Defendants.     )

MEMORANDUM  OPINION  AND  ORDER

MITCHELL, Magistrate Judge:

      Presently before the Court is a motion for summary judgment submitted by the defendants.  For reasons discussed below, the defendants' motion for summary judgment (Document No. 22) is granted.

      The plaintiff, Joseph E. Wheeler, has filed a race discrimination and civil rights complaint against defendants Pennsylvania Department of Corrections ("DOC") S.C.I.- Fayette, a state correctional institution in Fayette County, PA where he formerly worked, and one of its officials, Lt. Shawn Nose.[1]  In his complaint, the plaintiff asserts that on April 17, 2005, while he was employed as a corrections officer at S.C.I.- Fayette, he was subjected to an unwarranted pat-

---

1.    In 1994, the plaintiff was employed by DOC and began work as a corrections officer at S.C.I. Pittsburgh.  He continued working there until 2005, when he was transferred to S.C.I. Fayette to work as a corrections officer.  Following the events that are the subject of his complaint, the plaintiff transferred back to S.C.I. Pittsburgh, where he is employed as a prison counselor.  See, defendants' statement of material facts at ¶¶ 1-3 and plaintiff's response thereto.

down search and a drug residue screening, and he had his vehicle searched by a K-9 dog in contravention of DOC's policies and procedures. On April 25, 2005, the plaintiff filed a grievance about the searches and complained of race discrimination, after which he avers he was subjected to two more drug residue screenings in retaliation for having grieved the matter.[2]

In his complaint, the plaintiff contends that DOC-S.C.I. Fayette discriminated against him because of his race, which is black, and/or in retaliation for having complained of discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII") and Pennsylvania law, as he is not aware of white corrections officers that were searched in a similar manner. As discussed more fully below, on April 17, 2005 (the day of the initial searches at issue), seventeen (17) DOC employees were randomly searched, including the plaintiff, and only three of them were black.[3] Under DOC policy, every staff member is to be searched at least twice per year which includes, at a minimum, a pat-down search and an electronic drug residue screening.[4]

The record shows that on the morning of April 17, 2005, when the plaintiff arrived for work at S.C.I. Fayette, he was told by Captain Manchas to go into a side room, and there, Lt. Krimpolsky, assisted by corrections officers Moats and Rohal, had the plaintiff empty his pockets, the contents of which they inspected. The plaintiff was given a pat-down search, had to place his thumb on an electronic drug testing machine, and was told by Captain Manchas to go

---

2. It appears that the two alleged retaliatory drug screenings occurred on August 25, 2005 and November 20, 2005. See, defendants' brief in support of their current motion at p. 11, n.8, and defendants' appendix of exhibits at Exhibit E, pp. 66 and 70.

3. See, defendants' statement of material facts at ¶¶ 17 and 20 and plaintiff's response thereto.

4. Id. at ¶ 10.

outside to see Lt. Nose.[5]  The plaintiff asserts that Manchas and Krimpolsky were nasty, overly aggressive and spoke to him in a demeaning manner.[6]

The plaintiff went outside to the parking lot to meet with defendant Nose, who demanded that he produce his driver's license.  The plaintiff testified that Lt. Nose yelled and screamed at him, was very demanding and was "in his face", especially when the plaintiff told Nose that his driver's license was in his car.[7]  Nose screamed at the plaintiff as he went to his car and got his license, and Nose told him to give his license to another official.  As Nose continued to speak to him, the plaintiff saw that a K-9 dog was placed in his car, presumably to search for contraband, after which the plaintiff was ordered to go back into the institution, where he reported to work.[8]

It is not disputed that on April 17, 2005, the plaintiff was searched as part of a planned random staff search -- prompted by a confidential tip to a K-9 sergeant that there would be an attempt to smuggle contraband into the prison that day.  A K-9 sergeant and his dog form a unit (the "K-9 unit"), and they are dispatched from DOC's central office in Harrisburg to various prisons; on April 17, 2005, based on the aforesaid tip, the K-9 unit was at S.C.I. Fayette.  Captain Manchas, who is S.C.I. Fayette's Security Captain, planned the exercise that day, and he randomly selected those who would be searched.  It is DOC's policy that every staff member may

_____

5.  Id. at ¶ 4.

6.  See, plaintiff's deposition at pp. 20-21.

7.  Id. at pp. 22-23.

8.  Id. at pp. 24-25, 27-28.

be subjected to a search when on state property with or without a reason.[9]

The plaintiff was not the target of the confidential tip. The actual target suspect called off work on April 17, 2005, but Captain Manchas decided to continue with the random search, since everything, including the K-9 unit, was in place.[10]

Captain Manchas designed the random search that day, and it was pre-approved by the deputy superintendent as an investigative/emergency search, which was planned to extend beyond the confines of the usual random search procedure. Under the usual random search procedure, a number of employees may be randomly selected to be screened with the electronic drug testing machine and patted down, and if they show no indicators of contraband, the search is finished. However, since the K-9 unit was already on site, the random search procedure was expanded. Based on the expanded confines of the search on April 17, 2005, the plaintiff was subjected to a K-9 vehicle search, even after he showed no indicators of contraband on the pat-down search and electronic drug testing machine. According to the defendants, had they not gone ahead with the expanded search that day after the target suspect called off work, it may have alerted the target that he or she was the focus of the investigation.[11] In addition, the security staff wanted to use the K-9 unit on site that day to reinforce the prohibition against bringing guns to work in one's vehicle (which could enable an inmate working outdoors to obtain a gun).[12]

---

9.   See, defendants' statement of material facts at ¶¶ 10, 11, 13 and 15 and plaintiff's response thereto.

10.   Id. at ¶ 12.

11.   Id. at ¶¶ 10, 15; and deposition of Stephen Glunt at pp. 32-33.

12.   See, defendants' statement of material facts at ¶ 16 and plaintiff's response thereto.

On April 17, 2005, there were seventeen (17) K-9 vehicle searches conducted at S.C.I. Fayette, one of which involved the plaintiff.[13]  On that day, Captain Manchas ordered Lt. Nose to search the interior of every randomly-selected employee's vehicle with a K-9 dog. Two K-9 dogs were used during the vehicle searches, but they were exclusively handled by Sergeants Arensburg and Kurek who became part of the facility's chain of command.  When the dogs were used in the vehicle searches, Lt. Nose stood back and merely observed them; however, when the dogs were removed from a vehicle, Nose aided in searching the interior of the vehicle.[14]

On April 25, 2005, the plaintiff filed an internal grievance on the searches.  The plaintiff's grievance was settled on June 16, 2005, but he expressed an intent to pursue the matter outside of the grievance process.[15]  On or about August 25, 2005 and November 20, 2005, the plaintiff was subjected to drug residue screenings at S.C.I. Fayette.

On January 4, 2006, the plaintiff filed intake questionnaires with the Equal Employment Opportunity Commission ("EEOC").[16]  On April 5, 2006, the plaintiff filed a verified charge of discrimination with the EEOC, which was dual-filed with the Pennsylvania Human Relations Commission ("PHRC").[17]  On December 13, 2006, the EEOC issued the plaintiff a notice of dismissal and a right to sue letter.[18]

---

13.  Id. at ¶ 20.

14.  Id. at ¶¶ 18-19.

15.  Id. at ¶ 26.

16.  Id. at ¶ 27.

17.  Id. at ¶ 28.

18.  Id. at ¶ 30.

On March 14, 2007, the plaintiff filed a six-count complaint against the defendants. As gleaned from the record, it appears that Count I is pled only against DOC S.C.I. Fayette, while the remaining claims are asserted against both defendants.

In Count I, the plaintiff contends that he was subjected to race discrimination in violation of Title VII.[19] In Count II, the plaintiff asserts a claim of race discrimination in violation of the Pennsylvania Constitution and/or state law, i.e., the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, et seq. ("PHRA").[20] In Count III, the plaintiff alleges that he was retaliated against for having complained of discrimination in violation of Title VII and state law. In Count IV, the defendants are said to have violated the plaintiff's Fourth Amendment rights under 42 U.S.C. § 1983. In Counts V and VI, the plaintiff asserts state law tort claims against the defendants for intentional infliction of emotional distress and trespass respectively. In his prayer for relief, the plaintiff seeks compensatory and punitive damages, declaratory and injunctive relief, and attorneys' fees and costs. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

The defendants have moved for summary judgment on all of the plaintiff's claims. Summary judgment is appropriate if no genuine issue of material fact is in dispute, and the movants are entitled to judgment as a matter of law. F.R.Civ.P. 56(c); Neumeyer v. Beard, 421 F.3d 210, 212-13 (3d Cir. 2005).

---

19. Count I could not lie against defendant Nose, even if the plaintiff sought to assert such claim against him. That is because Title VII does not provide for individual liability. Sheridan v. E.I. Dupont de Nemours & Co., 100 F.3d 1061, 1078 (3d Cir. 1996).

20. As pled, it was unclear whether Count II pertained only to DOC S.C.I. Fayette or both defendants. However, in opposing summary judgment, the plaintiff clarified that Count II is asserted against both defendants.

With respect to the plaintiff's state law claims, the defendants argue that they are entitled to summary judgment on several grounds, including that they are immune from suit pursuant to the Eleventh Amendment of the United States Constitution and/or sovereign immunity, that the PHRA claims are untimely, and that the complaint fails to state viable claims against them. We agree that the defendants are entitled to summary judgment on the plaintiff's state law claims.

As for DOC S.C.I. Fayette, it is immune from the plaintiffs' state law claims by virtue of the Eleventh Amendment. Absent a waiver of immunity, the Eleventh Amendment bars suits against a state in federal court. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 104 (1984).[21] Eleventh Amendment immunity also extends to agencies, instrumentalities, or arms of the state. Mt. Healthy City Sch. Dist. Bd of Educ. v. Doyle, 429 U.S. 274, 280 (1977).

There are exceptions to Eleventh Amendment immunity, such as when a state waives its immunity and consents to suit in federal court, or where Congress has specifically abrogated the state's Eleventh Amendment immunity in legislation or a particular statute. See, College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999). No such exceptions to immunity are applicable on the plaintiff's state law claims.[22]

---

21. The Eleventh Amendment to the United States Constitution provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign State." The United States Supreme Court has explained: "While [the Eleventh] Amendment by its terms does not bar suits against a State by its own citizens, this Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Edelman v. Jordan, 415 U.S. 651, 662-663 (1974).

22. By statute, the Commonwealth of Pennsylvania has not consented to be sued in federal
(continued...)

Clearly, DOC is an agency or arm of Pennsylvania, as it is an "administrative department" obligated to perform "administrative work of this Commonwealth". See, 71 P.S. § 61. Hence, DOC is protected from suit by virtue of the Eleventh Amendment, <u>Lavia v. PA Dept. Of Corrections</u>, 224 F.3d 190, 195 (3d Cir. 2000), as is S.C.I. Fayette, which is a sub-unit of DOC. <u>Demyun v. PA Dept. Of Corrections</u>, 2001 WL 1083936, *3 & n.3 (M.D.Pa., Sept. 14, 2001). Thus, DOC S.C.I.-Fayette is entitled to Eleventh Amendment immunity on the plaintiff's state law employment discrimination claims in Counts II and III. <u>Rhodes v. S.C.I. Somerset</u>, 2007 WL 2406947, *8 (W.D.Pa., Aug. 21, 2007); <u>Fitzpatrick v. PA Dept. of Transp.</u>, 40 F.Supp.2d 631, 635 (E.D.Pa. 1999). Likewise, it is afforded Eleventh Amendment immunity from the state law tort claims against it in Counts V and VI. See, <u>Wikert v. PA Dept. Of Transp.</u>, 2008 WL 169702, *1 (W.D.Pa., Jan. 17, 2008); <u>Demyun</u>, <u>supra</u>, 2001 WL 1083936, at *5.

With respect to defendant Shawn Nose, "[t]he Eleventh Amendment also extends to suits for retrospective monetary relief against state officials in their official capacities". <u>Fitzpatrick</u>, <u>supra</u>, 40 F.Supp.2d at 634, citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 169-70 (1985). Thus to the extent that defendant Nose is sued in his "official capacity", he too is entitled to Eleventh Amendment immunity on the state law claims which seek monetary damages. <u>Id.</u>; <u>Lekich v. Municipal Police Ed. Training Com'n</u>. 2009 WL 513260, *7 (E.D.Pa., Feb. 26, 2009).

As to the PHRA claims asserted against defendant Nose in his individual capacity, he is not entitled to immunity from them. See, <u>Dennison v. PA Dept. Of Corrections</u>, 268

---

22. (...continued)
court, 42 Pa.C.S.A. § 8521(b). Further, "Pennsylvania has not waived its Eleventh Amendment immunity to claims under the Pennsylvania Constitution or the PHRA." <u>Fitzpatrick v. Commonwealth of PA, Dept. Of Transp.</u>, 40 F.Supp.2d 631, 635 (E.D.Pa. 1999).

F.Supp.2d 387, 405 (M.D.Pa. 2003); <u>Fitzpatrick</u>, 40 F.Supp.2d at 635. Still, Lt. Nose is entitled to summary judgment on the PHRA claims asserted against him in Counts II and III.

Under the PHRA, an individual may be held liable for retaliatory discrimination, or for aiding and abetting a discriminatory employment practice. See, 43 Pa.C.S.A. §§ 955(d) & (e). Presumably, the plaintiff purports to allege in Count II that Lt. Nose aided and abetted a discriminatory employment practice, while in Count III, Nose is said to have retaliated against the plaintiff in violation of the PHRA. As discussed <u>infra</u>, the plaintiff has failed to establish an employment discrimination claim or a retaliation claim against the defendants. Likewise, the plaintiff's PHRA claims against Lt. Nose are time-barred.[23]

To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged discriminatory act. 43 P.S. § 959(h). A plaintiff may also timely initiate a PHRA claim if he files a charge of discrimination with the EEOC within 180 days of the alleged discriminatory act and requests it to cross-file the charge with the PHRC. <u>Seybert v. International Group</u>, 2009 WL 722291, *17 (E.D.Pa., Mar. 18, 2009). "Absent circumstances justifying equitable tolling, if no complaint is filed with the PHRC within [180 days of the alleged discriminatory act], then the plaintiff is precluded from seeking judicial relief." <u>Gharzouzi v. Northwestern Human Services of PA</u>, 225 F.Supp.2d 514, 526 (E.D.Pa. 2002), citing <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913 (3d Cir. 1997).

Here, on April 5, 2006, the plaintiff filed a verified charge of discrimination with

---

23. The plaintiff incorrectly argues that the defendants waived their timeliness defense, as they did not raise it in their answer. However, in their Sixth and Ninth Affirmative Defenses, the defendants averred: "Plaintiff's claims are barred by the statute of limitations", and "Plantiff failed to exhaust his administrative remedies with respect to all of the claims in the complaint."

the EEOC claiming race discrimination and retaliation, and he requested the charge to be dual-filed with the PHRC.[24]  Clearly, the April 5, 2006 charge was not filed within 180 days of the alleged unlawful searches on April 17, 2005, nor the alleged retaliatory drug residue screening on August 25, 2005.[25]  Although the other alleged retaliatory drug screening on November 20, 2005 falls within 180 days of the plaintiff's charge, the plaintiff does not allege, and the record fails to show that Lt. Nose personally participated in either of the alleged retaliatory drug screenings.[26]

To the extent that the plaintiff alleges in Count II that Lt. Nose's actions violated the Pennsylvania Constitution, Nose is entitled to sovereign immunity on such claim for reasons discussed infra.  Also see, Robinson v. Ridge, 996 F.Supp. 447, 449 (E.D.Pa. 1997) ("there is no waiver of general sovereign immunity for claims based upon the Pennsylvania Constitution"), aff'd., 175 F.3d 1011 (3d Cir. 1999) (Table).  Thus, Lt. Nose is entitled to summary judgment on Counts II and Count III.

With respect to the state law tort claims against Nose in Counts V and VI, he is entitled to sovereign immunity from them.  Under Pennsylvania law, the Commonwealth, its

---

24.  See, defendants' statement of material facts at ¶ 28 and plaintiff's response thereto.

25.  As discussed above, the plaintiff filed intake questionnaires with the EEOC on January 4, 2006, wherein he complained of race discrimination on April 17, 2005.  However, the intake questionnaires did not constitute a formal PHRA charge, and they were not filed within 180 days of the alleged race discrimination on April 17, 2005.

26.  See, defendants' statement of material facts at ¶ 21.  In response thereto, the plaintiff asserts that defendant Nose was "on the team for selecting persons for [the] random searches".  However, no evidence shows that Lt. Nose selected the plaintiff for the random searches at issue.  Rather, Captain Manchas was responsible for ensuring that personnel were randomly searched at least twice per year in conformance with DOC policy.  See, deposition of Shawn Nose at pp. 17-18.  Even assuming, arguendo, that defendant Nose was involved in the search on November 20, 2005, the plaintiff has failed to establish a retaliation claim as discussed infra.

agencies, officials and employees are generally immune from suits for damages except in cases where the General Assembly has specifically waived immunity. See, 1 Pa.C.S. § 2310. Under 42 Pa.C.S. § 8522(b), there are nine statutory exceptions where the Generally Assembly has specifically waived the Commonwealth's sovereign immunity, none of which are applicable here.[27] Since it is not disputed that Lt. Nose was acting within the scope of his employment during his complained-of acts, he is entitled to sovereign immunity from the tort claims against him. See, Story v. Mechling, 214 Fed.Appx. 161, 163-64 (3d Cir. 2007); Larsen v. State Employees' Retirement System, 553 F.Supp.2d 403, 420 (M.D.Pa. 2008). Thus, for reasons discussed above, the defendants are entitled to summary judgment on the plaintiff's state law claims in Counts II, III, V and VI.

The defendants also insist that summary judgment is appropriate on the plaintiff's federal law claims in Counts I, III and IV. We agree.

Count I and the federal law claim in Count III arise under Title VII and are asserted against DOC S.C.I. Fayette. In Count I, the plaintiff claims that on April 17, 2005, DOC S.C.I. Fayette subjected him to race discrimination by virtue of its illicit searches.

In Title VII cases as here, where a charge of employment discrimination is filed with both the EEOC and a parallel state agency (i.e., the PHRC), the charge must be filed within 300 days from the date of the alleged unlawful employment practice. Burgh v. Borough Council of Montrose, 251 F.3d 465, 469 (3d Cir. 2001).

---

27. The exceptions to sovereign immunity are: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous road conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa.C.S. § 8522(b).

Here, the plaintiff filed unverified intake questionnaires with the EEOC on January 4, 2006, complaining of race discrimination -- not retaliation, which he specified occurred on April 17, 2005.[28]  On April 5, 2006, the plaintiff filed a verified charge of discrimination with the EEOC, wherein he asserted a claim of race discrimination, retaliation and a "continuing violation" of discrimination.[29]  Since the plaintiff's verified charge of discrimination arising from the searches on April 17, 2005 was not filed within 300 days of those searches, it is time-barred unless it "relates back" to the filing of his intake questionnaires.[30]

We find that the plaintiff's verified charge of discrimination relates back to his timely-filed intake questionnaires, together with a letter from his attorney to the EEOC dated December 29, 2005, apprising it that "Mr. Wheeler desires to file a Complaint against SCI

---

28.  See, defendants' statement of material facts at ¶ 27 and plaintiff's response thereto.

29.  Id. at ¶ 28.

30.  Although the plaintiff argues otherwise, the alleged unlawful searches on April 17, 2005, combined with the alleged retaliatory searches on August 25, 2005 and November 20, 2005, do not constitute a "continuing violation" so as to make all of the searches timely.  In National RR Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002), the U.S. Supreme Court limited the applicability of the continuing violation doctrine, holding that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  That is because "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."  Id.  In Morgan, the Court held that the continuing violation doctrine is not applicable to "[d]iscrete acts such as termination, failure to promote, denial of transfer or refusal to hire" because "[e]ach [such] incident of discrimination ... constitutes a separate actionable 'unlawful employment practice'".  Id. at 114.  Our Court of Appeals has stated that in addition to those discrete acts listed in Morgan, other discrete acts that constitute a separate actionable claim include: "wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation."  O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006).  As explained in O'Connor, "causes of action that can be brought individually expire with the applicable limitations period."  Id. at 128.  Thus, the discrete searches to which the plaintiff complains are not actionable as part of a continuing violation.

Fayette and Lt. Nose growing out of discriminatory search practices."[31]  It is not disputed that the plaintiff's intake questionnaires were not verified[32]; nonetheless, the plaintiff's subsequent verified charge cured that technical defect.  See, <u>Cunningham v. Freedom Ford Sales</u>, 2007 WL 2404739, *2 (W.D.Pa., Aug. 17, 2007).  Indeed, pertinent EEOC regulations provide:

> a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.  A charge may be amended to cure technical defects or omissions, including the failure to verify the charge, or to clarify or amplify the allegations made therein.  Such amendments ... will relate back to the date the charge was first received.

29 C.F.R. § 1601.12(b).  The United States Supreme Court has held that the EEOC's above "relation-back regulation [is] an unassailable interpretation of [Title VII]".  <u>Edelman v. Lynchburg College</u>, 535 U.S. 106, 118 (2002).[33]

Having determined that the plaintiff's claim of race discrimination is timely, we

---

31.    See, defendants' appendix of exhibits at Exhibit D, pp. 20-29 (intake questionnaires) and p. 39 (letter to EEOC).

32.    EEOC regulations provide that a charge of discrimination must "be in writing and signed and shall be verified."  29 C.F.R. § 1601.9.  To be "verified", the charge must be "sworn to or affirmed before a notary public ... or other person duly authorized by law to administer oaths [or] supported by an unsworn declaration in writing under penalty of perjury."  29 C.F.R. § 1601.3(a).

33.    In a recent case arising under the Age Discrimination in Employment Act ("ADEA"), the Supreme Court held that an intake questionnaire, together with a detailed supporting affidavit constituted a "charge" under the ADEA, explaining that a document constitutes a charge if it (i) provides the information required by relevant regulations, and (ii) is "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and employee."  <u>Federal Express Corp. v. Holowecki</u>, 128 S.Ct. 1147, 1157-60 (2008).  Certainly, the plaintiff's intake questionnaires and his counsel's aforesaid letter to the EEOC satisfy those criteria.

assess the merits of his claim. In cases alleging employment discrimination, a plaintiff can establish his claim either by the presentation of direct evidence of discrimination, or from indirect evidence which creates an inference of unlawful discrimination. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 n.4 (3d Cir. 1999). A plaintiff attempting to establish direct evidence of discrimination "faces a high hurdle". Connors v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir. 1998). "[T]he direct evidence must be so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." Id.

Here, the plaintiff has not established direct evidence of discrimination. Thus, his Title VII claim will be analyzed under the burden-shifting analysis articulated in McDonnell Douglas v. Green, 411 U.S. 792 (1973) and Texas Dep't. of Community Affairs v.Burdine, 450 U.S. 248 (1981) for cases involving indirect evidence.[34]

Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. See, Burdine, 450 U.S. at 252-53. In cases as here, where a plaintiff alleges disparate treatment because of his race or color, he may meet this burden by showing: (1) he was a member of a protected class; (2) he was qualified for the position which he held; (3) despite his qualifications, he was subjected to an adverse employment action; and (4) he was treated less favorably than persons outside of the protected class, thereby raising an inference of unlawful discrimination. McDonnell Douglas, 411 U.S. at 802.

"The burden of establishing a prima facie case of disparate treatment is not

---

34.    We note that the analysis required for adjudicating claims under Title VII also applies for claims asserted under the PHRA. Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 317 n.3 (3d Cir. 2000).

onerous." Burdine, 450 U.S. at 253.  A plaintiff must prove by a preponderance of the evidence that he was subjected to an adverse employment action under circumstances which give rise to an inference of unlawful discrimination.  Id.

Here, the plaintiff has not established a prima facie case of race discrimination. Claims of discrimination under Title VII are limited in scope "to actions that affect employment or alter conditions of the workplace."  Burlington Northern & Sante Fe Railway Co. v. White, 548 U.S. 53, 62 (2006).  Thus, to give rise to a claim of discrimination under Title VII, a plaintiff must suffer an adverse employment action that is "'sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment' or to 'deprive [him] of employment opportunities or otherwise adversely affect his status as an employee'".  Davis v. City of Newark, 285 Fed. Appx. 899, 2008 WL 2973912, *4 (3d Cir., Aug. 5, 2008), quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1296-97 (3d Cir. 1997), abrogated on other grounds by Burlington Northern, supra.  In this case, the plaintiff has not presented evidence to show that DOC S.C.I. Fayette subjected him to an adverse employment action, i.e., altered the terms, conditions or privileges of his employment.

In addition, the plaintiff has failed to show that he was subjected to disparate treatment.  A plaintiff can establish an inference of discrimination by showing he was treated differently than similarly-situated employees outside the protected class.  Blue v. Defense Logistics Agency, 181 Fed. Appx. 272, 274 (3d Cir. 2006), cert. denied, 127 S.Ct. 1336 (2007). Here, the plaintiff has not identified any comparators to show that he was subjected to disparate treatment; nor has he shown that he was treated less favorably than persons outside the protected class.  Since the plaintiff has not established a prima facie case of race discrimination, summary

judgment on Count I is appropriate.

In Count III, the plaintiff contends that DOC S.C.I. Fayette retaliated against him for filing a grievance on the initial alleged unlawful searches when it subjected him to further drug screenings on August 25, 2005 and November 20, 2005. The plaintiff's retaliation claim is to be analyzed under the burden-shifting analysis articulated in McDonnell Douglas and Burdine. See, Woodson, supra, 109 F.3d at 920. Under this framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation. See, Burdine, 450 U.S. at 252-53.

To establish his prima facie case, the plaintiff must show: (1) that he engaged in an activity protected by Title VII; (2) that his employer took an adverse employment action against him; and (3) that there was a causal connection between his participation in the protected activity and the adverse employment action. Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006). Certainly, the plaintiff satisfied the first prong of his prima facie case when he filed a grievance and complained of discrimination, because protesting or making complaints to management constitutes activity protected by Title VII. Id. at 343.

However, the plaintiff has not established the latter two prongs of his prima facie case. To satisfy the second prong of a prima facie case, "a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'". Id. at 341, quoting Burlington Northern, 548 U.S. at 68. Whether an employer's action is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Burlington Northern, 538 U.S. at 71.

We find that DOC S.C.I Fayette's alleged retaliatory acts of subjecting the plaintiff to drug residue screenings on August 25, 2005 and November 20, 2005 were not so "materially adverse" as to dissuade a reasonable worker like the plaintiff from making a charge of discrimination. We are guided by the fact that on April 17, 2005, the defendants subjected the plaintiff to an expanded drug search -- consisting of a drug residue screening, as well as a pat-down search and a K-9 search of his vehicle. That expanded search did not dissuade the plaintiff from filing an internal grievance on the searches, during which he expressed an intent to pursue the matter beyond the grievance process; indeed, after his grievance was settled, the plaintiff filed an EEOC charge of discrimination against the defendants. Further, since it was DOC's policy to search every staff member at least twice per year, which included, at a minimum, a pat-down search and a drug residue screening, the alleged retaliatory drug residue screenings at issue were not so materially adverse as to dissuade a reasonable worker from making a charge of discrimination. Thus, the plaintiff has not shown that his employer took an adverse employment action against him.

Likewise, the plaintiff cannot establish the third prong of his prima facie case. To do so, "a plaintiff must show a causal connection between [his] opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Moore, 461 F.3d at 341-42. As discussed above, in subjecting the plaintiff to the drug residue screenings at issue, DOC S.C.I. Fayette did not take action that might have dissuaded the plaintiff from making a charge of discrimination.

In addition, the plaintiff has not shown a causal connection between the filing of

his internal grievance and his subsequent drug residue screenings. To find the necessary causal link for retaliation, case law focuses on two main factors: "timing and evidence of ongoing antagonism." Abramson v. William Paterson College, 260 F.3d 265, 288 (3d Cir. 2001).

As for timing, "an usually suggestive proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection." Marra v. Philadelphia Housing Authority, 497 F.3d 286, 302 (3d Cir. 2007). That was the case in Jalil v. Advel Corp., 873 F.2d 701, 708 (3d Cir. 1989), where a plaintiff was discharged two days after filing an EEOC complaint. However, "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation". LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n., 503 F.3d 217, 233 (3d Cir. 2007).

Here, lapses of four months and seven months occurred between the filing of the plaintiff's internal grievance on April 25, 2005 and his drug residue screenings on August 25, 2005 and November 20, 2005. Clearly, the temporal proximity of the drug residue screenings to the internal grievance are not "unusually suggestive" of a retaliatory motive.

"Where the time between the protected activity and the adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee". Marra, supra, 497 F.3d at 302. Unfortunately for the plaintiff, he has proffered no evidence of antagonistic conduct or animus against him which would support an inference of causation. Based on the foregoing, summary judgment is appropriate on Count III.

In Count IV, which arises under 42 U.S.C. § 1983, the plaintiff claims that the

defendants violated his Fourth Amendment right to be free from unlawful searches.[35]  DOC

S.C.I. Fayette is entitled to summary judgment on this claim, as it is not a "person" subject to suit

under § 1983.  See, Will v. Michigan Dept. Of State Police, 491 U.S. 58, 70-71 (1989); Fullman

v. PA Dept. Of Corrections, 2007 WL 257617, *3 (M.D.Pa., Jan. 25, 2007).

 As for defendant Nose, a state official acting in his "official" capacity is not a

"person" under § 1983 and hence, not subject to damages thereunder.  Will, supra, 491 U.S. at

71.  However, a state official sued in his "individual" capacity is a "person" for purposes of

§ 1983 liability.  Hafer v. Melo, 502 U.S. 21, 27 (1991).  Furthermore, the Eleventh Amendment

does not bar a § 1983 claim against a state officer sued in his individual capacity.  Id. at 31.

 Importantly, "[a] defendant in a civil rights action must have personal

involvement in the alleged wrongs".  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

A supervisory official may be rendered personally liable under § 1983 if he participated in

violating a plaintiff's rights, directed others to violate such rights, or had knowledge of and

acquiesced in such violations.  Baker v. Monroe Twp, 50 F.3d 1186, 1190-91 (3d Cir. 1995).

 With respect to the searches at issue here, the plaintiff has not alleged, and the

record fails to show that Lt. Nose had any involvement in the April 17, 2005 pat-down search

and drug reside screening, or the subsequent drug residue screenings on August 25, 2005 and

November 20, 2005.  However, Lt. Nose did assist in the April 17, 2005 search of the plaintiff's

---

35. In pertinent part, 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ..."

vehicle, after a K-9 dog searched the exterior and interior of the vehicle with its handler.[36]

As to the staff vehicle searches on April 17, 2005, Lt. Nose testified that it was the first time he was involved in such searches, and he informed the K-9 Sergeants of that fact[37]; that the K-9 Sergeants handed him a consent form, told him to have staff members sign the form and said they would take care of everything else[38]; and that Nose had the plaintiff sign the consent form, observed a K-9 dog and its handler search the vehicle, after which Nose assisted in searching the interior of the vehicle for contraband, which took 5-10 minutes.[39] Lt. Nose did not place the K-9 dog in the plaintiff's vehicle. Indeed, the plaintiff testified that he observed a K-9 dog was in his vehicle while he stood conversing with Lt. Nose outside the institution.[40]

We must determine whether Lt. Nose's search of the plaintiff's vehicle violated the Fourth Amendment. The Fourth Amendment guarantees the "right of the people to be secure in their persons ... and effects ... against unreasonable searches and seizures." U.S. Const. Amend IV. "[T]he reasonableness of a search under the Fourth Amendment is an issue of law." Wilcher v. City of Wilmington, 139 F.3d 366, 373 (3d Cir. 1998).

Typically, for a search to be "reasonable" under the Fourth Amendment, it must be supported by a warrant or probable cause, unless the search entails a well-established exception to the warrant and probable cause requirements. Neumeyer, supra, 421 F.3d at 213;

---

36. See, deposition of Shawn Nose at pp. 71-72.

37. Id. at pp. 29, 71.

38. Id. at p. 71.

39. Id. at pp. 66-73.

40. See, plaintiff's deposition at pp. 24-27.

Wilcher, supra, 139 F.3d at 373.  The United States Supreme Court has explained that "[n]either a warrant nor probable cause, nor, indeed any measure of individualized suspicion, is an indispensable component of [Fourth Amendment] reasonableness in every circumstance."  Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989).  Thus, "where a Fourth Amendment intrusion serves special government needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context."  Id. at 665-66.  Accord, Neumeyer, 421 F.3d at 214 ("there are instances when a search furthers a 'special governmental need' beyond that of normal law enforcement such that the search, although not supported by the typical quantum of individualized suspicion, can nonetheless be found constitutionally 'reasonable'.").

As explained in Neumeyer, the "applicability of the special needs doctrine to the prison context is evident."  Id.  That is because:

> The penal environment is fraught with serious security
> dangers.  Incidents in which inmates have obtained drugs,
> weapons, and other contraband are well-documented ...
> Within prison walls, a central objective of prison admini-
> trators is to safeguard institutional security.  To effectuate
> this goal prison officials are charged with the duty to
> intercept and exclude by all reasonable means all contraband
> smuggled into the facility.

Id., quoting Hunter v. Auger, 672 F.2d 668, 674 (8th Cir. 1982).

In Neumeyer, our Court of Appeals opined that the policy of DOC prison officials in subjecting prison visitors' vehicles to random searches for contraband was a "special needs search", rising beyond their general need to enforce the law.  421 F.3d at 214.  The Court explained that "the government need not show probable cause or even reasonable suspicion to

support [such] a search" under the special needs doctrine; instead, it must show "that its search meets a general test of 'reasonableness'. Id. "Under this standard, the constitutionality of a particular search 'is judged by balancing the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests' beyond that of typical law enforcement.'" Id., quoting Wilcher, 139 F.3d at 373-74. In Neumeyer, the Court balanced these interests and found that the vehicle searches were a "relatively minor inconvenience" when "balanced against the [DOC prison officials'] special need to maintain the security and safety of the prison that rises beyond their general need to enforce the law", such that the "suspicionless searches" were valid and reasonable. 421 F.3d at 214, citing Spear v. Sowders, 71 F.3d 626, 632-33 (6th Cir. 1995); and Romo v. Champion, 46 F.3d 1013, 1016 (10th Cir. 1995).

Similarly, in the context of random searches of prison officials' vehicles which are parked on or about prison grounds, and may be accessible to prison inmates, Courts utilize a general test of reasonableness -- not proof of reasonable suspicion -- to determine if the search comports with the Fourth Amendment . See, McDonnell v. Hunter, 809 F.2d 1302, 1309 (8th Cir. 1987) (balancing an individual's expectation of privacy in his vehicle, which is not great, against the interests of the correctional institution in maintaining security, the Court found: "it is not unreasonable to search vehicles that are parked within the institution's confines where they are accessible to inmates. Such searches may be conducted without cause but must be done uniformly or by systematic random selection of employees whose vehicles are to be searched. It also is not unreasonable to search on a random basis ... employees' vehicles parked outside the institution's confines if it can be shown that inmates have unsupervised access to those vehicles."). Accord, True v. Nebraska, 2009 WL 562239, *3-*4 (D.Neb., Mar. 4, 2009) ("Given

[the DOC employee's] diminished expectation of privacy and the government's justification for its search, [DOC's] demand that [its employee] submit to a suspicionless search of his personal vehicle parked on [DOC] property did not violate [the employee's] Fourth Amendment rights.").

Here, in conducting such a balancing test, it is clear that "employees of incarceration facilities ... have diminished expectations of privacy while they are within the confines of the jail." Allegheny County Prison Employees Independent Union v. County of Allegheny, 315 F.Supp.2d 728, 737 (W.D.Pa. 2004), aff'd., 124 Fed. Appx. 140 (3d Cir. 2005), cert. denied, 546 U.S. 873 (2005). In Allegheny County Prison Employees, supra, this Court held that "routine patdown searches [of prison employees] that occur over clothing ... when they occur in connection with a jail's security procedures, do not require reasonable suspicion." 315 F.Supp.2d at 739, aff'd, 124 Fed. Appx. 140 (3d Cir. 2005). Clearly, "[t]he search of a vehicle is much less intrusive than a search of one's person." McDonnell, supra, 809 F.2d at 1309, citing Almeida-Sanchez v. United States, 413 U.S. 266, 279 (1973) (Powell, J., concurring).

In contrast to the "relatively minor inconvenience" of a vehicle search as occurred here, DOC prison officials have a legitimate governmental interest in safeguarding the security of a prison from an influx of contraband and weapons. Neumeyer, 421 F.3d at 214. In this case, the plaintiff was searched as part of a planned random staff search on April 17, 2005 -- prompted by a confidential tip to a K-9 sergeant that there would be an attempt to smuggle contraband into the prison that day.[41] Although the target suspect called off work that day, Captain Manchas decided to proceed with the search, as the K-9 unit was on the premises, and he feared that a canceled

---

41. See, defendants' statement of material facts at ¶ 10 and plaintiff's response thereto.

search would alert the target that he or she was the focus of the investigation.[42] Also, by searching staff vehicles, the security staff wanted to reinforce the prohibition against bringing guns to work in one's vehicle, where inmates working outdoors could have access to them.[43] Based on the random nature of the vehicle searches at issue, we find that Lt. Nose's search of the plaintiff's vehicle was reasonable and did not require individualized suspicion.

The defendants also argue that the plaintiff consented to the random searches at issue as an express condition of his employment with DOC. Indeed, DOC's Code of Ethics provides in relevant part: "All individuals, including employes [sic], are subject to search upon entrance or egress from a state facility or at any time while on state property owned by [DOC]."[44] The defendants also point out that a sign on the access road to S.C.I. Fayette provides in part:

PENNSYLVANIA DEPARTMENT OF CORRECTIONS

NOTICE

THIS IS A STATE CORRECTIONAL INSTITUTION,
ALL PERSONS, VEHICLES AND PERSONAL PROPERTY
ENTERING OR BROUGHT ON THESE GROUNDS ARE
SUBJECT TO SEARCH. DRUG DETECTION DOGS AND
ELECTRONIC DEVICES MAY BE USED FOR THIS
PURPOSE...[45]

Based on the forgoing, the plaintiff was aware that he and his personal property, including his vehicle, were subject to search at any time by electronic devices and K-9 dogs.

---

42. Id. at ¶¶ 12, 15.

43. Id. at ¶ 16.

44. See, defendants' appendix of exhibits at Exhibit E, p. 31, ¶ 24.

45. See, defendants' statement of material facts at ¶ 25 and plaintiff's response thereto.

However, the parties have not stipulated to the fact that the plaintiff consented to the search. While Lt. Nose testified that the plaintiff signed a consent form authorizing the search, no such consent form appears in the record. Thus, having found that the search of the plaintiff's vehicle was reasonable, we do not decide whether the plaintiff consented to the search.

As an alternate ground for summary judgment on this issue, the defendants argue that Lt. Nose is entitled to qualified immunity. Assuming, arguendo, that the search of the plaintiff's vehicle was not reasonable, we agree that Lt. Nose would be entitled to qualified immunity on the Fourth Amendment claim.

Qualified immunity protects government officials performing discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800 (1982). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991). Qualified immunity is available if "reasonable officials in their position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." Larsen v. Senate of the Commonwealth of PA, 154 F.3d 82, 87 (3d Cir. 1998).

Under Fourth Amendment case law cited above, no reasonable suspicion is needed for the following searches: (1) searches that further a special government need beyond the normal need for law enforcement, such as random vehicle searches of prison visitors' vehicles; (2) random vehicle searches of correction officers' vehicles parked on or about prison premises which are accessible to inmates; and (3) routine pat-down searches of prison employees that

occur over clothing in connection with a prison's security procedures.  In light of such case law, and under the circumstances here, it would not have been clear to a reasonable officer searching the plaintiff's vehicle (knowing the search was much less intrusive than a search of one's person) that he was violating the Fourth Amendment.  Therefore, for reasons discussed above, the defendants are entitled to summary judgment on Count IV.

An appropriate Order will be entered.

<u>O  R  D  E  R</u>

AND NOW, this 11th day of June, 2009, for the reasons set forth in the

Court's Opinion and Order,

IT IS ORDERED that the defendants' motion for summary judgment (Document

No. 22) is granted.


<u>s/ ROBERT C. MITCHELL</u>
United States Magistrate Judge